**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.  ) | No. 16 CR 337 |
| ) | |
| ROSALINDA PEREZ, ) | Ronald A. Guzmán |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

For the reasons stated below, Defendant's motion to suppress [65] is denied.

### STATEMENT

Rosalinda Perez moves for entry of an order suppressing her statements to law enforcement officials on April 20, 2016. alleging that the Federal Bureau of Investigation ("FBI"): (1) failed to provide her with *Miranda* warnings prior to custodial interrogation; (2) only provided limited warnings after obtaining statements from her, thus circumventing the purpose of *Miranda*; and (3) employed coercive measures to obtain involuntary statements from her, all in violation of her constitutional protections. (Def.'s Mot., Dkt. # 65.) The Court held an evidentiary hearing on October 17, 2017 and December 14, 2017. For the reasons stated below, the motion to suppress is denied.

**Facts**

At the evidentiary hearing, Special Agent Christopher Alan Hedges, a thirteen-year veteran of the FBI, testified that during the summer of 2015, he was investigating drug trafficking at a store named Roma III (also referred to as "The Basement") on the South Side of Chicago.[1] During the course of the investigation, Agent Hedges acquired evidence that Roma III was being utilized as a heroin distribution point for a Chicago street gang, and that Defendant, the owner and manager of Roma III, was involved. Agent Hedges and others developed a plan to approach Defendant and attempt to gain her cooperation in the investigation in order to gather evidence against other targets. To accomplish this, Agent Hedges testified that he wanted to approach Defendant discreetly so that no one else would know she was cooperating. The plan to flip Defendant included refraining initially from interrogating her and cautioning her to remain silent while Agent Hedges laid out the case against her and explained why she should cooperate. At times, Agent Hedges referred to the plan as a recruitment pitch. According to Agent Hedges,

---

[1] Unless otherwise indicated, the facts come from the hearing testimony of Agent Hedges. (10/17/17 Hr'g Tr., Dkt. # 76.)

if Defendant refused to cooperate, law enforcement would have arrested her, and a search warrant would have been executed at Roma III.

The plan to approach Defendant was executed on April 20, 2016, when members of Agent Hedges' team, including Special Agents Alison Foy and Michael Bucaro, conducted surveillance to locate Defendant. Based on information from other members of the team, Agents Foy and Bucaro found Defendant driving in the vicinity of 31st Street and Grove Avenue in Berwyn, Illinois at approximately 8:45 a.m.[2] (12/14/17 Hr'g Tr., Dkt. # 77, at 93-94.) Agent Foy testified that she and Agent Bucaro approached Defendant's car from the opposite direction and pulled their black Crown Victoria in front of Defendant's car, with their covert lights on, but no siren activated. (*Id*. at 95-96.) After blocking Defendant's ability to continue driving, Agents Foy and Bucaro exited their car with their guns drawn and, using "loud verbal commands," ordered Defendant out of her car. (*Id*. at 96.)[3] According to Agent Foy, the plan involved a felony car stop of Defendant based on the evidence they had regarding her drug-trafficking activities, and pursuant to Agent Foy's training, such stops are effectuated with weapons drawn. (*Id*. at 97.) After Defendant got out of her car, she complied with Agent Foy's directive to raise her hands. (*Id*. at 118.) Agent Foy then approached Defendant, re-holstered her gun, and conducted a pat-down search of Defendant to ensure she had no weapons, which she did not. (*Id*. at 98, 120.) According to Agent Foy, she then told Defendant that there were two agents who wanted to speak with her. (*Id*. at 98-99.) Agent Foy did not *Mirandize* or handcuff Defendant, and took her to a minivan located nearby, which was occupied by Agent Hedges and Special Agent Rakow. (*Id*. at 99-100.) Agent Foy estimated that her interaction with Defendant from the time of the stop to taking her to the minivan lasted less than two minutes, and stated that neither she nor Agent Bucaro used any force or threatened Defendant during their encounter with her. (*Id*. at 100.) Agent Foy also testified that while Defendant seemed startled and confused, she was not crying or yelling. (*Id*.)

Inside the minivan, Agent Hedges, who was wearing a suit and holding a notebook, stated he was sitting in the second-row captain's chair behind the driver's seat while Agent Rakow positioned herself in the third row of seats.[4] When Defendant was brought to the

---

[2] In a previous affidavit, Agent Hedges attested that Defendant was stopped at approximately 9:15 a.m. At the hearing, Agent Hedges acknowledged that the 9:15 a.m. time was incorrect, and that after reviewing the records of the stop, he understood that it actually occurred at approximately 8:45 a.m.

[3] While Defendant consistently asserts that Agents Foy and Bucaro pointed their guns at her head, the record citation she provides does not support that characterization.

[4] Agent Foy testified that when she later delivered Defendant's cell phone and wallet to her in the minivan, the two agents were in the second row while Defendant was in the far back row. (12/14/17 Hr'g Tr., Dkt. # 77, at 102.) The Court acknowledges this discrepancy in the agents' testimony but does not find it sufficiently material to diminish the credibility of their testimony or alter the Court's conclusion with respect to Defendant's motion to suppress.

minivan, she entered and sat in the captain's chair next to Agent Hedges, whose weapon was holstered and remained so throughout the entire interview. Agent Hedges testified that while Defendant appeared anxious and confused, she was not crying, and that his demeanor toward Defendant was "professional." He denied that either he or Agent Rakow yelled at Defendant at any time during their encounter with her, or that Defendant was handcuffed at any point that day. Agent Hedges stated that when Defendant initially entered the minivan, neither he nor Agent Rakow read Defendant her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), because it was not the agents' intention to interrogate or question Defendant at that point.

According to Agent Hedges, Defendant was informed that the agents did not expect her to say anything initially, but that they just wanted her to listen to the facts about their investigation and the evidence they had against her. She was then told that the FBI had been conducting a long-term investigation into the Black P. Stone Nation ("BPSN") street gang, and had evidence that she was involved in drug-trafficking activities with the gang. Specifically, Agents Hedges and Rakow told Defendant that they had evidence that heroin had been purchased at her store, and that she had participated in certain financial crimes. The agents informed Defendant of the charges she faced and the possible prison sentence she could receive if convicted, and that in exchange for her cooperation, she could potentially receive leniency with respect to both. Agent Hedges testified that they never threatened or lied to Defendant. Defendant was allowed to make telephone calls to her son and daughter, after which the agents told Defendant that they wanted her to cooperate in the investigation as an informant. Defendant agreed to have a conversation about being a cooperator.

Agent Hedges testified that after Defendant stated she was interested in discussing cooperating with law enforcement, he read her the FBI advice-of-rights (FD-395) form and then gave it to her to read. After Defendant had finished reviewing the form, Agent Hedges asked Defendant if she understood and whether "everything made sense," to which Defendant responded "yes." Defendant then waived her rights and Agent Hedges asked her to sign the form. Agent Hedges testified that he asked her to sign the form only once and that neither he nor Agent Rakow forced Defendant to sign the form.

Thereafter, the agents questioned Defendant about her criminal activities for approximately three hours. In summary, Defendant described starting as a cashier at Roma III and becoming a manager, and then owner, of the store when the original owner, Florencio "Jose" Marin, who was involved in drug trafficking, passed away. At that time, Jose's drug supplier approached Defendant and offered to continue the drug-trafficking arrangement with her. Defendant agreed and thereafter engaged in purchasing and selling both heroin and cocaine to certain individuals, one of whom was an informant for the FBI. During the agents' conversation with Defendant in the minivan, she consented to the search of her phone and her vehicle. (Consent to Search, Gov't Ex. 4, Dkt. # 68-5.) In the days that followed, Defendant apparently had second thoughts about her agreement to cooperate; in a meeting at the FBI's offices on April 27, 2016, she announced that she thought she needed to talk to a lawyer. At that point, according to Agent Hedges, all questioning of Defendant stopped, and no further attempts were made to

induce her to cooperate.[5]

On cross-examination, Agent Hedges testified that the stop of Defendant's car on April 20, 2016 was not a traffic stop for a driving violation, but rather a planned stop to provide an opportunity to speak alone with Defendant about her potential cooperation with the government. Agent Hedges did not participate in the initial stop of Defendant's car, which was pre-planned, and according to Agent Hedges, Defendant was caught by surprise by the stop. The decision to take Defendant into custody if she refused to cooperate was approved by the U.S. Attorney's Office. While Agent Hedges and his team knew that Defendant occasionally took a young child to school in the mornings, they were not aware that she did so every day, but had observed her taking the same route back to her house on several previous occasions. The law enforcement officers did not want to stop her while she had a child in the car and did not do so. Although Agent Hedges testified that their intent was to discreetly discuss cooperation with Defendant, defense counsel's cross-examination established that Defendant was stopped on a public street in a residential neighborhood in Berwyn. Agent Hedges did not observe the actual stop of Defendant's automobile by the other members of the team, and his and Agent Rakow's conversation with Defendant in the minivan was not recorded. Defendant was dressed in her pajamas at the time of the stop. Agent Hedges acknowledged that he had recommended to Defendant that, for her own safety, she keep her agreement to cooperate confidential.[6]

---

[5] Moreover, the Court concludes that it need not consider Defendant's affidavit, which she submitted as part of her initial motion to suppress. The government notes in its post-hearing brief that while Defendant implied in her affidavit that the agents forced Defendant to take them to her home after they questioned her in the van, Defendant admitted at the hearing that she asked to go to her home before escorting agents to Roma III. (Gov't's Resp., Dkt. # 79, at 7 n.5.) Defendant contends that the government's use of the affidavit for this one point of impeachment allows the Court to consider all of the statements in her affidavit. The Court, however, did not take the purported inconsistency into account for purposes of ruling on this motion given that Defendant's hearing testimony was stricken, as discussed in footnote 6. Thus, the Court need not consider Defendant's affidavit. Even if it did consider the affidavit, the Court finds that Defendant's affidavit testimony, which has not been subjected to cross-examination, is not as compelling as the in-person testimony of the FBI agents at the hearing.

[6] Both Defendant and the government address the issue of Defendant's hearing testimony having been stricken as a result of her refusal to answer a question posed to her by the government. Specifically, after Defendant agreed that she had denied selling drugs from her storefront when asked that question by Agents Hedges and Rakow, the government inquired whether the denial was a lie – in other words, inquired whether she had in fact sold drugs from Roma III. Defense counsel objected, arguing that Defendant's response could be incriminating. The Court agreed with the government that the question was appropriate as it not only went to Defendant's state of mind at the time she was being questioned by the agents, and thus the voluntariness of her waiver of her Fifth Amendment rights (*i.e.*, if she had the presence of mind and willpower to undertake to deceive the agents, that fact could tend to show that she did not feel that her will was overcome), but also reflected on her credibility. This issue – Defendant's state of mind during

**Analysis**

Voluntariness of a confession depends on whether it is "the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004). Factors relevant to determining whether a confession was coerced include the suspect's age, intelligence, education, mental state; whether she received *Miranda* warnings; the length and environment of the interrogation, including the suspect's access to food or a restroom; and law enforcement's conduct. *United States v. Ross,* 510 F.3d 702, 709 (7th Cir. 2007).

While Defendant makes several arguments regarding the FBI's operation plan and the agents' failure to adhere to it, whether the operation plan was faithfully adhered to is largely irrelevant.What matters for purposes of determining whether Defendant voluntarily confessed to her participation in criminal activity is what the officers did at the time of the stop and recruitment pitch. As is detailed above, law enforcement agents had evidence that Defendant had been dealing large amounts of controlled substances in association with a street gang for a significant period of time. She properly was considered a potentially dangerous person. *See United States v. Mitten*, 592 F.3d 767, 777-78 (7th Cir. 2010) (noting that "[d]rug dealers deal with people who are often desperate and violent"). The agents were thus entitled to be cautious in the process of detaining Defendant, including drawing their weapons during the most dangerous portion of any such action -- the actual street stop. Moreover, Agent Foy testified that her FBI training called for the use of weapons when performing a felony stop. The guns were not an unnecessary intimidation tactic.

---

her discussion with the agents – is particularly crucial in the case at bar as the main thrust of Defendant's motion is that she was a frail "grandmother" who was particularly susceptible to coercion or intimidation at the hands of law enforcement officers who descended upon her with guns drawn. The Court had an extended discussion with counsel regarding this issue and ultimately ruled that Defendant either had to answer the question or her entire testimony would be stricken. Defendant, at the direction of her lawyer, declined to answer the question, and her testimony was stricken. To the extent that Defendant asks the Court in her post-hearing brief to revisit its decision on this issue, it declines to do so. While Federal Rule of Evidence 104(b) provides that "[b]y testifying on a preliminary question, a defendant in a criminal case does not become subject to cross-examination on other issues in the case," because Defendant's credibility was "inextricably tied" to the resolution of whether her statements were voluntary, the government's question on cross-examination was proper. *See United States v. Roberts*, 14 F.3d 502, 517 (10th Cir. 1993); *see also United States v. Davis*, No. 10-20896-CR, 2011 WL 3703119, at *1 (S.D. Fla. Aug. 23, 2011) (finding that "the government is permitted to cross-examine the defendant on matters related to the underlying offenses for purposes of impeaching the defendant's credibility at the suppression hearing."). The Court further notes that "once defendant takes the stand on th[e] preliminary matter [here, the motion to suppress], Rule 104(d) does not permit him to define the question of voluntariness." *Roberts*, 14 F.3d at 517.

Physically abusive interrogation tactics constitute coercion *per se*. *Stein v. New York*, 346 U.S. 156, 182 (1953), overruled on other grounds by *Jackson v. Denno*, 378 U.S. 368 (1964). "Interrogation tactics short of physical force can also amount to coercion," including "long interrogation sessions or prolonged detention paired with repeated but relatively short questioning." *Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017) (*en banc*). Nevertheless, courts have upheld various police tactics such as appeals to a suspect's conscience, trickery, or bluff. *Id.* (citing *Procunier v. Atchley*, 400 U.S. 446, 453-54 (1971) (suspect was deceived into confessing to false friend to obtain insurance payout to children and stepchildren); *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (deceiving suspect about another suspect's confession)). The Seventh Circuit has stated that "the police d[o] not exceed their bounds by frightening [defendant] with the specter of jail . . . ." *United States v. Sablotny*, 21 F.3d 747, 753 (7th Cir. 1994). Nor do assurances that an officer will advise the prosecutor or court of a defendant's cooperation render a statement involuntary. *United States v. Walker,* 272 F.3d 407, 412 (7th Cir. 2001). The Court applies a totality-of-the-circumstances test in evaluating voluntariness. *United States v. Wilbon*, 309 F. App'x 27, 31 (7th Cir. 2009).

The evidence here is clear that the circumstances surrounding the stop did not undermine the voluntariness of Defendant's confession. Defendant was not physically harmed or mistreated in any way, nor was she threatened with physical harm in order to obtain her cooperation. In fact, after verifying that she was not armed, Agents Foy and Bucaro re-holstered their weapons, and Defendant was not handcuffed at any point during her interaction with the agents. In addition, Agents Hedges and Rakow kept their weapons holstered while they spoke with Defendant in the van.

Nor has Defendant pointed to any evidence of non-physical coercion sufficient to cause her statements to the agents to be deemed involuntary. Defendant's argument appears to be that by stopping her on a public street with their guns drawn, informing her that she had been the subject of surveillance, describing the evidence collected against her, and stating their intent to arrest her unless she agreed to cooperate, the agents coerced her into waiving her rights. But this argument makes little sense given that the officers would clearly have been within their rights to make a full custodial arrest, take her to FBI headquarters, charge her, and then seek a waiver of her *Miranda* rights.[7] Under the guidelines set forth in the cases cited above, addressing *Miranda* issues in a van as opposed to a police station after methodically informing Defendant of the evidence against her and the charges she faced does not constitute coercion, physical or otherwise. *See id.* (finding that even assuming law enforcement agents had financed the defendant's crack habit and induced him to come to a restaurant far from his home and then cornered him, the defendant's subsequent statements were voluntary and his free will was not overcome because, among other things, the defendant was 42 years old and had a bachelor's degree, there was no evidence he was under the influence of any drugs or alcohol at the relevant

---

[7] The defense does not argue that there was insufficient probable cause to arrest, which is likely due to the fact that probable-cause evidence was overwhelming.

time, he was told that he was not under arrest at the restaurant, he had money he could have used to leave the restaurant of his own accord, and he was read his *Miranda* rights upon arriving at the FBI office).

To the extent Defendant points to the fact that she was in her pajamas and wearing no bra, she chose to drive her child to school dressed in that manner, and must have had some degree of comfort in doing so given the lack of evidence that she did so involuntarily. Further, the Court notes that Defendant points to no evidence that the officers had any prior knowledge as to how Defendant would be dressed so as to deliberately gain an advantage over her. Moreover, Defendant was stopped by law enforcement a short distance from her home in a location with which she was familiar and through which she traveled as part of her daily routine. Such circumstances do not indicate that law enforcement overcame Defendant's will.

The Court comes to the same conclusion with respect to the manner in which the pitch to cooperate and subsequent interrogation was conducted. The credible testimony of the FBI agents established that Defendant was not physically threatened, lied to, verbally abused, or intimidated. Being stopped and questioned by police is generally a scary proposition for anyone, but without more, does not point to a basis for finding Defendant's statements involuntary. The interrogation was not physically or mentally exhausting, either in duration or by virtue of the conditions of her detention, and none of the traditionally forbidden practices of interrogation were utilized in this case.[8] The only pressures Defendant was subjected to in this case are those pressures inherent in any custodial interrogation, and the cure for such inherent pressure is the proper application of the *Miranda* warnings.[9] Defendant was specifically told not to make any statements until the agents had an opportunity to explain the situation to her. She was then advised of her rights, and

---

[8] The evidence of Defendant's drug dealing with Chicago street-gang members belies her attempt to characterize herself as a frail "grandmother" who was particularly susceptible to coercion or intimidation at the hands of law enforcement officers. As an initial matter, at 49 years old, Defendant is not an elderly grandmother. Moreover, participating in drug deals with gang members requires a certain mental resoluteness. This was not a mentally frail, easily intimidated person. The agents described Defendant's demeanor as nervous, scared, and confused at first, but calm and ready to speak with them after their initial explanation. Defendant's use of inflammatory language (*i.e.*, referencing the stop as an "abduction" and "restraint," calling the agents' approach "outrageous" and their discussion with Defendant "abusive") notwithstanding, the Court finds the agents' testimony was credible and consistent as to the material issues, and any discrepancies as to timing or setting were minor.

[9] "[I]n-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures …. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda*, 384 U.S. at 467.

only after she waived both her Fourth and Fifth Amendment rights in writing did the agents take a statement from her and conduct a search of her car and her phone.

      For these reasons, the motion to suppress is denied.

**Date:** February 27, 2018

                                                 */s/ Ronald A. Guzmàn*
                                        **Ronald A. Guzmàn**
                                        **United States District Judge**