IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 16 CR 337 |
| v. | ) |
| | ) Hon. Ronald A. Guzmàn |
| ROSALINDA PEREZ and MANUELA CHAVEZ, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, the government's motion to admit evidence pursuant to Federal Rule of Evidence 801(d)(2)(E) [109] is granted.

## STATEMENT

Under *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), overruled in part on other grounds by *Bourjaily v. United States*, 483 U.S. 171 (1987), the trial court may preliminarily determine whether statements by a coconspirator of the defendant will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination, the Court must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id*. at 1134.

Here, the government alleges that during a conspiracy lasting approximately three years, Willie Slater purchased kilogram quantities of heroin and cocaine from Rosalinda Perez at her store, Roma III. Perez allegedly "fronted" narcotics to Slater who would pay for the narcotics after he had sold them. The government further alleges that as part of the conspiracy, Perez, Manuela Chavez, and Individual A sold narcotics for cash on multiple occasions to Slater, and that these transactions took place inside Roma III. On average, Slater purchased a kilogram of

heroin and a kilogram of cocaine per month. Each purchase, of course, would require a subsequent payment.

The government presents the transaction which occurred on August 28, 2015 as its most compelling proof that Chavez was a co-conspirator. On that occasion, Slater visited Roma III to receive a kilogram of heroin from Perez. After arriving at Roma III, Perez directed Slater to follow Chavez into a back room of the store, telling Slater only that, "You should go with her [Chavez]." Slater followed Chavez into the back room, where Chavez placed a kilogram of heroin wrapped in brown tape into a shoebox. Slater asked Chavez if he should take the box to the front, and Chavez stated, "I'll take it to the front." Slater then walked to the checkout counter, where he purchased a pair of socks from Perez. As Perez handed Slater a shopping bag containing the socks, Chavez passed Slater a second shopping bag containing the shoebox with the heroin inside. Slater then exited Roma III and agents recovered the heroin.

In its opposition to the government's *Santiago* proffer, Chavez first argues that the government has failed to meet its burden of showing that Chavez was a member of the Slater-Perez conspiracy. Chavez's conduct during this transaction, however, leads to the inference that Perez had instructed Chavez as to what she should do upon Slater's arrival, or that Chavez already knew what to do from prior experience; otherwise, Chavez would not have known what to do simply from Perez's instruction to Slater that he should follow Chavez into the backroom. Once in the backroom, Chavez placed a brick of heroin wrapped in brown tape inside a shoebox so that Slater could see what Chavez was doing. She then placed the shoebox in a shopping bag and, in response to Slater's inquiry, responded that she would take the shopping bag (with the kilo of heroin) back to the front of the store. Chavez did this without any contemporaneous instruction from Perez.

From this evidence, the Court can reasonably conclude that Chavez knew to hold onto the box and not transfer it to Slater until she could do so in a manner that would indicate to any observer that the transfer was merely part of an ordinary purchase of merchandise at the front of the store. In her objection to the *Santiago* proffer, Chavez offers no reasonable explanation as to why she would willingly engage in this subterfuge if she was unaware of the illegal nature of the transaction. It is, of course, possible that she merely followed Perez's explicit instructions without ever asking why she was being instructed to perform this unusual sequence of events, but that is not the most likely explanation. Nor is it likely that Perez would trust Chavez to show Slater the heroin he was being given but not actually give it to him until a sham purchase could be performed if Chavez was not a willing participant in the conspiracy.

The government has indicated it will show that, on occasion, Chavez also received large sums of money from Slater as payment for the fronted drugs. It is possible that Perez chose to give Chavez access to and control of the heroin and drug proceeds and to participate in the actual handoff of each without informing her of the true nature of the transaction, but, again, this is hardly the most likely explanation. Perez's statement indicates that she was required to account to her supplier for the drug money and would face dire consequences if she did not. Perez was on notice that she risked physical harm or even death if something went wrong and she could not pay her supplier.[1] This is not unusual. Drug traffickers cannot resort to conventional legal methods of enforcing their "contractual rights" without incriminating themselves; thus, violence is their most common tool of enforcement. Under pressure from such threats, it is most unlikely

---

[1] In a conversation with Slater regarding his late payment for a fronted shipment of drugs, Perez explained that her supplier was quite serious about their transactions: "He had my throat, had my throat. He almost put my head on a platter." (Gov't's Mot., Dkt. # 109, at 13.)

that Perez would place control of the drugs and drug money for which she was accountable with anyone whom she did not completely trust.

In addition, one would expect that Perez and Chavez had a close working relationship; they were, after all, partners in the retail business of Roma III. It is reasonable to believe that they would be required to work closely in the day-to-day operations of the store. It is highly unlikely that Perez would be able to run a large narcotics-trafficking conspiracy for such a long period of time without her partner, Chavez, being aware of what she was doing. Under such circumstances, the Court finds that it is more likely true than not that Chavez knew exactly what she was doing when she transferred possession of the narcotic drugs to Slater and received payment for the drugs from Slater. Her actions were calculated to further and had the effect of furthering the conspiracy.

Chavez cites to caselaw establishing that mere knowledge of the existence of the conspiracy, mere presence during a transaction, or even innocent furnishing of services to the conspiracy is insufficient to establish membership in a conspiracy. This is true. But it is not the Court's function at this point in the proceedings to establish Chavez's guilt or innocence. The Court need only find sufficient evidence to conclude that it is more likely true than not that Chavez knowingly and intentionally participated in the conspiracy. In doing so, the Court may take into account the reasonable inferences to be drawn from the government's proffer of evidence. *See United States v. Rodriguez*, 975 F.2d 404, 411 (7th Cir. 1992) ("The trial court is in the best position to sort through the Government's proffered evidence and make the necessary inferences to determine whether the 801(d)(2)(E) standard has been met."). Indeed, conspiracies by their very nature are secretive. It is unlikely that direct evidence of the existence of a conspiracy will be available; more often than not, the existence of a criminal conspiracy is

proven by circumstantial evidence, as is presented here. The Court may consider the relationship of the parties, their overt acts, and the totality of their conduct as proof of an agreement to conspire. *See United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000) ("[T]he government may establish the existence of a conspiracy, and the defendant's involvement in importing heroin, 'through circumstantial evidence and any reasonable inferences drawn therefrom involving the defendant['s] relationship, overt acts, and overall conduct.'") (citation omitted).[2] The Court has done precisely this and finds that the government's proffer is sufficient to establish by a preponderance of the evidence the existence of the conspiracy and Chavez's knowing and intentional participation in the same.

Finally, Chavez argues that the government's motion should be denied because it "inexplicably declined to specify which statements it is asking this Court to rule on." (Chavez's Resp., Dkt. # 121, at 6.) According to the government, it anticipates "introducing consensual video and audio recordings of interactions Slater had with Perez, Chavez, and Individual A at Roma III in August and September 2015," including, but not limited to, an August 27, 2015

---

[2] As noted by the Seventh Circuit, certain evidence indicates the presence of a conspiracy versus a mere buyer-seller relationship:

> For example, sales of large quantities of drugs, repeated and/or standardized transactions, and a prolonged relationship between the parties constitute circumstantial evidence of a conspiracy. *See, e.g., United States v. Avila,* 557 F.3d 809, 816 (7th Cir. 2009); *United States v. Contreras,* 249 F.3d 595, 599 (7th Cir. 2001); *United States v. Zarnes,* 33 F.3d 1454, 1465 (7th Cir. 1994). And ordinarily, the government may prove a conspiracy on circumstantial evidence alone. *Avila,* 557 F.3d at 815-16; *United States v. Townsend,* 924 F.2d 1385, 1390 (7th Cir.1991); *United States v. Redwine,* 715 F.2d 315, 320 (7th Cir.1983) ("The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof.").

*United States v. Johnson*, 592 F.3d 749, 754–55 (7th Cir. 2010)

video and audio recording between Slater and Perez at Roma III; an August 28, 2015 audio and video recording of Slater, Perez and Chavez at Roma III; a September 2, 2015 recording between Slater and Perez at Roma III; September 10 and 21, 2015 audio and video recordings documenting Slater delivering $21,120.00 and $18,800.00 cash payments to Individual A at Roma III; Perez's statement to FBI agents when she was detained in April 2016; and the contents of consensual recordings of and testimony by Slater describing the distribution of narcotics to him as well as the acceptance of narcotics money from him. The government notes that it has not detailed every proposed coconspirator statement, but has instead provided a representative sample. The Court assumes that all such recordings have been disclosed to the defendants. For purposes of this motion, that disclosure is sufficient.

**Date**: June 4, 2019

_____
**Ronald A. Guzmán**
**United States District Judge**